**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**DALE E. RICHARDS,**

       **Plaintiff,**

                             **Civil Action 2:12-cv-748**
    **v.**                       **Judge Michael H. Watson**
                             **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

       **Defendant.**

**REPORT AND RECOMMENDATION**

Plaintiff brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security  ("Commissioner") denying his application for social security disability insurance benefits.  This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors, the Commissioner's Memorandum in Opposition to the Plaintiff's Statement of Errors, and the administrative record. (ECF Nos. 13, 14, 10.)   For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and the Commissioner's decision be **AFFIRMED**.

**I. BACKGROUND**

Plaintiff filed his application for benefits on March 4, 2009, alleging that he has been disabled since June 12, 2007, at age 38.  (R. at 121-24.)  Plaintiff alleges disability as a result of a back injury and pain.  (R. at 164.)  Plaintiff's application was denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge ("ALJ").

ALJ J. Richard Stables held a video hearing on November 9, 2010, at which Plaintiff, represented by counsel, appeared and testified.  (R. at 42-53.)  Jerry A. Olsheski, a vocational expert, also appeared and testified at the hearing.  (R. at 53-55.)  On January 10, 2011, the ALJ

issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 6-18.)  On June 14, 2012, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1-4.)  Plaintiff thereafter timely commenced the instant action.

## II. HEARING TESTIMONY

### A.    Plaintiff's Testimony

At the administrative hearing, Plaintiff testified that he has a ninth grade education. (R. at 29.)  He testified that he had recently taken classes to earn his General Equivalency Degree ("GED"), but that he had difficulty completing the work due to difficulty concentrating understanding the material.  (ECF No. 33.)

Plaintiff testified that he last worked as a carpenter on June 12, 2007, when he suffered a work-related injury.[1]  (R. at 28-29.)  Prior to working as a carpenter, Plaintiff testified that he worked in the field of maintenance at various apartment complexes for approximately four years, as a forklift operator, and a delivery driver.  (R. at 30, 31, 32.)

Plaintiff alleges disability as a result of his June 12, 2007 work-place injury.  (R. at 35.) He testified that he fell approximately 8-10 feet from scaffolding, and hit the concrete below. (R. at 35, 41.)  As a result of the fall, Plaintiff testified that he suffers from pain in his lower back, neck, right hip, and both knees.  (R. at 36.)  He also indicated that he suffers from headaches at least once a week, with each one lasting a day or two.  (R. at 36-37.)  He also testified that he suffers from pain that "comes and goes" in his right arm and wrist as a result of the fall.  He stated he takes pain medication and muscle relaxers throughout the day.  (R. at 38-

---

[1] Plaintiff testified that he attempted to work as a carpenter at some point after his injury.  He indicated that he was terminated from the position prior to the end of his thirty-day probationary period due to an inability to perform the work because of his physical impairments.  (R. at 30.) Plaintiff testified, "I physically couldn't do the job."  *Id.*

2

39.)  Plaintiff further testified that he suffers from recurrent kidney stones.  (R. at 39.)  He testified that he passed fifty or sixty kidney stones in the three years prior to the hearing, and that he has undergone multiple procedures to break up the stones.  (R. at 39, 50.)  In addition, Plaintiff testified that he has been diagnosed with hepatitis C.  (R. at 39.)

Plaintiff testified that he gets an average of just three or four hours of sleep per night.  (R. at 40.)  He stated that he wakes up during the night due to pain and discomfort.   As a result, Plaintiff testified that he feels tired frequently.  He indicated that he can stand for no more than twenty minutes at a time before he has to sit down due to pain in his right hip and lower back.  (R. at 40-41.)  He testified that he can walk for approximately thirty minutes before he has to sit and rest due to pain.  (R. at 41.)  In terms of his ability to sit for extended periods, Plaintiff testified that he has to stand after sitting for no more than thirty minutes due to pain.  (R. at 42.)  He stated that the most he can lift is ten to fifteen pounds.

Plaintiff also testified that he suffers from various mental impairments.  He stated that he suffers from depression and that he cries often.  (R. at 43.)  He testified that he cries at least once per day, anywhere from one to three hours at a time.  (R. at 44.)  He indicated that he feels sad because he can no longer do things he used to, such as playing with his grandkids, fishing, boating and hunting.  Plaintiff testified that he doubts he is capable of working in a position that requires him to sit all day.  He stated he would probably call in sick or leave early too often due to his impairments.

Plaintiff testified that on a good day he may be able to take a walk and get the mail.  (R. at 45.)  On a bad day he stated he will remain in bed due to pain or depression.  He stated that his pain ranges from five to eight on a ten-point scale, even with his medication.  (R. at 46-47.)  He limits his driving because shifting gears causes him pain.  He stated that he sleeps and watches

3

movies during the day.  (R. at 48.)  Sometimes he helps with dishes, dusting, and grocery shopping.  (R. at 50.)  He testified that he visits a couple of friends and his grandchildren.  *Id.*

**B.**     **Vocational Expert Testimony**

Jerry A. Olsheski, testified as the vocational expert ("VE") at the administrative hearing. (R. at 53-55.)  The ALJ asked the VE to assume a person with Plaintiff's education and work-experience was limited to lifting ten pounds frequently and twenty pounds occasionally; walking or standing no more than two hours in an eight-hour work day; sitting no more than six hours; and kneeling and squatting only occasionally.  (R. at 52.)  The ALJ asked the VE to further assume that the person could never climb ladders, ropes, or scaffolds; and that he can handle only moderately complex tasks but not highly complex tasks.  *Id.*  In addition, the ALJ asked the VE to assume that the person must avoid situations that require strict production quotas or outputs; and that he could handle only relatively static duties.  "It doesn't mean totally unchangeable," the ALJ elaborated, "but relatively static or stale."  (R. at 52-53.)

The VE testified that an individual with the stated limitations would be unable to perform Plaintiff's past work experience.  The VE further testified that such an individual could perform sedentary, unskilled jobs that exist in the local and national economy, including jobs as an assembler, production inspector, or hand packer.

On cross examination, the VE testified that if a limitation for a "sit/stand option" was added to the hypothetical, the potential jobs for the individual would be reduced by fifty percent. (R. at 54.)  He further testified that an individual would likely be unable to hold a job if he were required to miss more than one day of work per month.  He also stated that the individual would likely be unable to hold a job if he were off-task more than fifteen percent of the time due to pain or some other distraction.  (R. at 56.)

4

### III. MEDICAL RECORDS

A. **Physical Impairments**

1.    **Doctor's Hospital**

Plaintiff first visited Doctors Hospital on March 26, 2007 complaining of ulcers.  (R. at 376.)  He reported a history of being medicated for acid reflux, as well as a history of kidney stones.  He indicated that his first experience with kidney stones occurred fifteen years prior to his visit.  He stated that he passed eight kidney stones in the year prior to this medical visit.  *Id.*

2.    **Robert I. Lewis, D.O., F.A.C.O.A.**

Plaintiff sought treatment from Dr. Lewis for kidney stones.  A March 31, 2007 ultrasound revealed mild swelling of the left kidney due to kidney stones.  (R. at 381.)  On April 13, 2007, Dr. Lewis diagnosed Plaintiff with kidney stones and a "ureteral calculus," which is a kidney stone that has made its way from the kidney to the ureteral.  (R. at 385.)  Dr. Lewis indicated that Plaintiff would require surgery to break up the stones.

By May 8, 2007, Dr. Lewis reported that he performed surgery to break up the stones, and that the procedure went well.  (R. at 386.)  Dr. Lewis indicated that he removed the stone that had made its way to the ureteral, but that he was unable to reach the stone in the left kidney.  (R. at 386.)  Consequently, Dr. Lewis decided to perform a non-invasive procedure to break the stone apart.  (R. at 386.)  On May 17, 2007, Dr. Lewis reported that he completely removed the stone with the noninvasive procedure.  (R. at 387.)  On May 23, 2007, Dr. Lewis noted that Plaintiff had been passing a lot of "gravel" since the procedures.  (R. at 388.)  He prescribed Percocet for the pain.  (R. at 388.)

3.    **Mount Carmel Hospital**

Plaintiff was taken to the emergency room at Mount Carmel Hospital on June 12, 2007 after falling from a scaffold while working.  (R. at 216-37.)  Doctors discovered that Plaintiff fractured his right femur bone, as well as his right elbow and wrist.  (R. at 217, 228-29.)  Doctors performed surgery on Plaintiff's right femur, which required placement of a metal rod into his leg.  (R. at 288-90.)

**4.      Medical Administrators, Inc.**

Plaintiff treated with various medical professionals following his work-place injury, including the physician who performed surgery on his femur, Dr. Karl Kumler.  On June 25, 2007, Dr. Kumler noted that Plaintiff was ambulating with the use of a crab crane.  (R. at 285.)  During the visit, Dr. Kumler removed the sutures from Plaintiff's hip, and noted that the incisions from surgery were healing nicely.

Plaintiff saw Dr. Gallanosa on July 9, 2008.  (R. at 443.)  He complained of "bad headaches," pain, depression, and lightheadedness.  He reported his pain at an eight on a ten-point scale.  On examination, Dr. Gallanosa noted that Plaintiff showed good strength in his lower limbs with good range of motion, and that his gait was normal.  Dr. Gallanosa prescribed medication for depression and to help Plaintiff sleep.

Plaintiff next saw Dr. Kumler on July 24, 2007, which was five weeks after his injury.  (R. at 284.)  Dr. Kumler noted that Plaintiff still used a cane, and that he experienced minimal pain when moving his right wrist.  Plaintiff complained of knee pain and tenderness over the femur.  Dr. Kumler indicated that Plaintiff should continue weightbearing on his right leg as tolerated, and work with increasing the range of motion of his wrist.  Dr. Kumler reported that Plaintiff was not ready to return to work.

6

When Plaintiff saw Dr. Kumler again on September 11, 2007, he reported an absence of pain in his wrist and forearm, but complained of continued pain in his right hip area. (R. at 281.) Although Plaintiff was still using a cane, Dr. Kumler reported that he could walk without assistance. On exam, Dr. Kumler noted pain with the rotation of Plaintiff's hip and an antalgic gait. He reviewed an x-ray of Plaintiff's leg and noted that the hardware was properly in place. Dr. Kumler indicated that Plaintiff should continue with therapy, discontinue use of the splint for his arm, and move away from using a cane as soon as possible.

Dr. Gallanosa examined Plaintiff on February 13, 2008. (R. at 348.) Plaintiff reported pain in his right lower leg, and pain going from his hip down to his right foot. He indicated that his pain worsens with standing or sitting. He reported his pain as an eight on a ten-point scale. Dr. Gallanosa noted Plaintiff's gait as antalgic with preference to his right leg. (R. at 349.) He noted that Plaintiff uses a cane, and that the range of motion in his legs appeared normal, except that he experienced mild pain in his hip on exam. Dr. Gallanosa noted that although Plaintiff had passed the expected period of recovery for his injury, he had not undergone a comprehensive physical therapy program. He noted that Plaintiff requires "extensive strengthening" of his right leg, as well as "conditioning to work on weaning him off his cane entirely and getting his endurance increased and his pain reduced." *Id.* He recommended that Plaintiff continue with physical therapy, and that he be weaned off of his narcotic medications entirely. Dr. Gallanosa further indicated that Plaintiff "is very young, and there is no reason to accept anything other than a full recovery." *Id.*

When Plaintiff saw Dr. Gallanosa again on February 28, 2008, he complained of continued pain in his right lower knee, as well as his back. (R. at 674.) He reported that he is able to sit, stand or walk for thirty minutes at a time. Dr. Gallanosa noted that Plaintiff used a

cane in his right hand, and indicated that Plaintiff had an antalgic gait with preference for the left leg.  Plaintiff saw Dr. Gallanosa again on March 17, 2008, during which time Dr. Gallanosa reported that Plaitniff "[d]oes show some improvement with gait," though she noted it as slightly antalgic with preference to the left leg.  (R. at 673.)  During an April 14, 2008 visit with Dr. Gallanosa, Plaintiff complained of pain in his hip and right knee, though he rated it as a two to three on a ten-point scale.  (R. at 671.)  Dr. Gallanosa reported that Plaintiff's physical therapy treatment notes indicate he has good overall strength in his right lower leg, although they reflected that he demonstrates a mild abnormal gait when fatigued.

Plaintiff next saw Dr. Gallanosa on May 14, 2008.  (R. at 670.)  He complained of continued pain in his right hip and knee.  He stated that he can sit or walk for 45 minutes or stand for thirty minutes.  When Plaintiff saw Dr. Gallanosa again on June 11, 2008, he reported experiencing "pain a lot more than normal."  (R. at 668.)  He rated his pain at a four on a ten-point scale.  During his next visit with Dr. Gallanosa on July 9, 2008, Plaintiff complained of headaches, pain, depression, dizziness and light-headedness.  (R. at 666.)  He reported that he can sit, stand or walk for thirty minutes at a time.  Dr. Gallanosa noted that she spoke with Plaintiff's psychologist, who indicated Plaintiff was experiencing adjustment issues and suggested he might benefit from anti-depressant medication.  Dr. Gallanosa prescribed medication for depression.

Plaintiff saw Dr. Gallanosa again on August 6, 2008.  (R. at 435.)  Plaintiff reported suffering from "really bad" headaches.  *Id.*  He reported continued pain in his back, neck, hip and knee.  He stated that he is able to sit, stand or walk for half an hour.  He reported that he sleeps two to three hours per night.  He reported his pain at a seven on ten-point scale.  Dr. Gallanosa noted Plaintiff's gait as slightly antalgic with preference for the left leg.

Plaintiff next saw Dr. Gallanosa on September 3, 2008.  (R. at 429.)  Plaintiff reported continued pain as well as migraine headaches.  He reported his pain as an eight on a ten-point scale.  Dr. Gallanosa recommended that Plaintiff see a chronic pain specialist and seek chiropractic treatment.

Plaintiff saw Dr. Kerner on September 17, 2008.  (R. at 659.)  Plaintiff reported continued pain in the right side of his back and his leg, which Dr. Kerner noted appears to be triggering migraine headaches.  He rated his pain as a nine on a ten-point scale and described it as constant.  Dr. Kerner noted that Plaintiff had an antalgic gait favoring the left side, "as his right side appears to be painful."  (R. at 660.)

Plaintiff saw Dr. Kerner again on September 24, 2008.  (R. at 427.)  He reported severe symptoms of back and leg pain, which he described as "shooting" from his back through his buttocks into his hip and to his knee.  *Id.*  Plaintiff reported that when these shooting pains occur they are a ten on a ten-point scale.  Dr. Kerner noted from x-rays that Plaintiff has mild degenerative disc disease at C5-C6.  He indicated that he would order x-rays to determine whether faulty hardware was causing Plaintiff's pain.  He also prescribed medication for nerve pain to determine whether nerve damage was the cause of Plaintiff's pain.  Plaintiff underwent x-rays of his right knee, right hip, and right femur on October 10, 2008.  (R. at 650-52.)  All x-rays yielded no abnormalities of Plaintiff's bones or placement of the hardware.

When Plaintiff saw Dr. Kerner again on September 30, 2008, he reported that he has started a carpentry job on modified duty allowing him to work six hours per day.  (R. at 422.)  He indicated that his probationary period was coming to an end and that he was concerned he is not performing sufficiently.  He also complained of a sharp shooting pain from his back to his

9

buttock into his hips and right knee. On exam Dr. Kumler noted that Plaintiff over-rotates his right foot. He ordered a right knee brace and a right heel lift to correct the over-rotation.

Plaintiff next saw Dr. Kerner on October 14, 2008. (R. at 415.) Dr. Kumler noted that x-rays show an absence of abnormality in Plaintiff's right knee, hip and femur. Plaintiff reported that his pain had gotten better in the past week with rest because he had not been working. Dr. Kumler advanced a "working diagnoses" of chronic myfascial pain. He noted that Plaintiff's pain was not caused by hardware abnormalities. He further reported that Plaintiff did not experience relief with the medication he was taking for nerve pain, which ruled out a nerve problem as the root of his pain.

Plaintiff saw Dr. Kerner again on October 28, 2008. (R. at 407.) Dr. Kumler noted that Plaintiff had been off work for three weeks and that his pain has improved significantly. Plaintiff reported his pain at a six on a ten-point scale. He indicated that his chiropractic visits had been bringing him relief, and that he was able to do some work around the house. On examination, Dr. Kumler noted tenderness with hip rotation. He noted that Plaintiff is able to walk with a normal gait across the room without any obvious limp. He was also able to walk on his toes and heels with good balance. (R. at 407.) Dr. Kerner indicated that Plaintiff is likely suffering from chronic myofascial pain.

Plaintiff saw Dr. Kerner again on January 20, 2009. (R. at 640.) Dr. Kerner noted that Plaintiff had been switched to a specific pain medication which he takes orally twice a day and "which has successfully decreased his pain and allowed him to increase his endurance throughout the day." *Id.* Plaintiff reported some continued pain in his right thigh and lower back, but stated that it "is much improved" on the new medication. *Id.* He reported pain in his lower back and right thigh at a five to six on a ten-point scale. He reported that he can sit or

10

stand for thirty minutes at a time and walk for fifteen minutes at a time. He stated that he sleeps two to three hours per night. Plaintiff stated that he receives physical therapy and engages in various at-home exercises. He stated that he planned to undergo a CT scan of the lower back to determine whether his pain-management doctor would perform injections or a block procedure to help with pain. Dr. Kerner noted that Plaintiff was able to walk without difficulty and without walking-aids. (R. at 641.) He further noted slight tenderness to palpitation in Plaintiff's lower back, especially along the spine, and over the right buttock and upper, right femur. Dr. Kerner also noted tenderness with hip rotation. Dr. Kerner concluded that Plaintiff has myofascial pain, but that his symptoms are nevertheless adequately controlled with chronic pain medication. He opined that Plaintiff "does appear ready to resume work at medium duty and a sit-down job at computers would probably be ideal." (R. at 642.)

Plaintiff saw Dr. Gallanosa on February 23, 2009. (R. at 463.) Plaintiff reported continued pain in his right hip as well as pain in his right elbow. He reported that he can sit or stand for half an hour and walk for five to ten minutes. Plaintiff reported that he sleeps three to four hours at night. On examination, Dr. Gallanosa noted tenderness in the area behind the right elbow, as well as in the right buttock, alongside the lower spine, and in the hip. Dr. Gallanosa indicated that she would order x-rays of Plaintiff's elbow to see "if there is anything new going on there." *Id.*

Dr. Gallanosa ordered various x-rays of Plaintiff's injuries, which were taken on February 26, 2009. (R. at 637, 638). The results of the x-ray of Plaintiff's right elbow suggested a chronic, partially healed, nondisplaced fracture. (R. at 637.) The reviewing physician indicated that an MRI of the elbow may be warranted to asses for internal derangement. *Id.* The results of the x-ray of Plaintiff's lower spine revealed no fracture or other significant

11

abnormality. The reviewing physician noted calcification likely related to Plaintiff's history of kidney stones.

Plaintiff saw Dr. Gallanosa again on April 14, 2009. (R. at 633.) Plaintiff complained of ongoing low back pain as well as hip and leg pain. He stated that he is able to sit, stand or walk for thirty minutes at a time. Dr. Gallanosa noted Plaintiff had an antalgic gait with preference for the left leg. He also noted Plaintiff uses a cane in his right hand. Dr. Gallanosa noted tenderness in Plaintiff's right lower back along his spine, as well as in the region at the top of his right femur bone. He further noted full strength in Plaintiff's legs, but indicated that the exam caused him pain.

### 5.    Banyan Tree Rehabilitation

Plaintiff underwent physical therapy and rehabilitation at Banyan Tree Rehabilitation for a short period of time following his injury. (R. at 273-322.) During his September 7, 2007 visit, Plaintiff stated that his right arm was feeling better, but that his right leg was causing him pain. (R. at 273.) Plaintiff rated his pain as a five to six on a ten-point scale. He engaged in therapeutic exercises, and his therapist noted that he had good technique. *Id.*

On September 20, 2007, personnel at Banyan Tree Rehabilitation reported that Plaintiff was progressing as expected. (R. at 278.) His "[r]ehab prognosis" was noted as good. *Id.* Plaintiff was discharged from Banyna Tree as he had completed his treatment. *Id.*

### 6.    Mark Hatheway, M.D.

On October 4, 2007, Plaintiff visited Dr. Hatheway for a second opinion regarding his broken leg. (R. at 280.) Dr. Hatheway noted that Plaintiff was using a cane in his left hand. He also noted that Plaintiff had full range of motion in his right hip and knee, as well as an absence of swelling. He indicated that Plaintiff's surgical wounds had healed "very nicely." *Id.* After

obtaining and reviewing an x-ray, Dr. Hatheway noted that Plaintiff's fracture "appears to be healing very nicely in good alignment and there is excellent position of the plate and screws." *Id.* Dr. Hatheway recommended that Plaintiff go through a work conditioning program, and further opined that Plaintiff was ready for such a program at that time. *Id.*

**7.    Alan H. Wilde, M.D.**

Dr. Wilde examined Plaintiff on behalf of the Bureau of Worker's Compensation on September 12, 2007.  (R. at 710.)  Plaintiff reported an absence of pain in his right elbow and wrist, but stated that he had constant pain in his right hip and knee.  Dr. Wilde noted that Plaintiff used a cane in his left hand, and that he walks with a limp on the right side.  On exam, Dr. Wilde noted tenderness along the area at the top of the right femur.  He also noted weakness in Plaintiff's right hip.  Dr. Wilde noted no abnormalities in Plaintiff's wrist, arm or elbow.  (R. at 711.)  He indicated that the current treatment Plaintiff was receiving was necessary and appropriate.  He recommended that Plaintiff continue physical therapy for his right hip, right wrist and right elbow.  Dr. Wilde opined that although Plaintiff was unable to return to work as a carpenter, he could do sedentary work at that time.  He further opined that Plaintiff would most likely be able to return to work as a carpenter upon completion of physical therapy when he could walk normally without a cane.

**8.    Wieging Family Chiropractic**

Plaintiff treated with Dr. Wieging from September 2007 through October 2008.  (R. at 793, 789.)  In his first visit with Plaintiff, Dr. Wieging noted that Plaintiff has a history of kidney stones.  (R. at 794.)  October 24, 2007, Dr. Wieging noted that Plaintiff appeared to be healing well with the hardware in his leg.  (R. at 276.)  He indicated that Plaintiff was still walking with a cane and experiencing "a significant amount of pain throughout the hip and leg."  *Id.*

13

On November 1, 2007, Dr. Wiegning authored a letter to Plaintiff's attorney. (R. at 367.) He added diagnoses of a sprain or strain to the hip and continued tissue damage resulting from the work accident. He reported that Plaintiff was experiencing severe tenderness in his hip and buttock region, and that the "right hip has completely lost any internal rotation." *Id.*

On January 10, 2008, Dr. Wiegning wrote in another letter, "[t]he bone will heal, however the soft tissue injuries surrounding this area has had extensive damage as well." (R. at 357.) He noted that "[o]bjectively, [Plaintiff] has essentially no internal or external rotation of his hip." *Id.*

On April 17, 2008, Dr. Wieging authored a letter to Dr. Gallanosa, in which he noted that Plaintiff was no longer using a cane, and that he showed a twenty-five percent decrease in range of motion in his right hip. (R. at 346.) He reported that although Plaintiff "has made substantial improvement," he still had weakness and pain in his right hip and leg. (r. at 347.) Dr. Wieging recommended further chiropractic visits to increase muscle strength.

**9.      Occupational Rehabilitation**

Beginning in March, 2008, Plaintiff participated in an eight-week rehabilitation program. (R. at 339-42.) In his April 29, 2008 discharge summary, the physical therapists and physician who oversaw his progress noted that his "current physical capacities are in the medium strength level." (R. at 339.) According to the discharge summary, throughout the eight-week program Plaintiff underwent two hours of activities per day that were designed to increase his overall strength, flexibility, and cardiovascular endurance. He also participated in general work simulated tasks, as well as functional material handling lifting. At the time of discharge, the discharging professionals noted that Plaintiff had been participating in these activities for a total of 6.5 hours per day, five days per week. They further reported that although Plaintiff

14

complained of "occasional right leg discomfort" at the level of three to five on a ten point scale, he "does not demonstrate any significant physical barriers that would limit his ability to return to work." *Id.* In terms of material handling, the discharging professionals indicated that Plaintiff demonstrated that he could sit and stand for sixty minutes with good tolerance; that he could walk frequent short distances and on uneven surfaces with good tolerance; and that he demonstrated good tolerance in bending and occasional kneeling, and the ability to climb stairs. (R. at 341.) They further noted that Plaintiff had a total of seven absences during the eight-week program, three of which being medically excused.

**10.    Dr. Shelley K. Boone**

Plaintiff treated with Dr. Boone for pain management beginning in November 2008. In a November 7, 2008 visit, Dr. Boone noted that she reviewed recent x-rays of Plaintiff's knees and that the results were unremarkable. (R. at 643.) Plaintiff reported continued pain that he indicated had prevented him from completing his activities of daily living for the past several weeks. On examination, Dr. Boone noted that Plaintiff appeared in no acute distress and that he was ambulating well with no assistive device. (R. at 644.) She indicated that Plaintiff "has well preserved range of motion of the hips and knees without significant discomfort." *Id.* She also noted tenderness to palpitation over Plaintiff's lower back along the spine. Dr. Boone indicated that she would order a CT scan of Plaintiff's lower spine to determine the cause of Plaintiff's pain. She opined that Plaintiff has pain subject to biomechanical changes following the femur fracture and some myofascial pain of the right lower arm. Dr. Boone started Plaintiff on an extended release opioid medication.

Plaintiff continued to treat with Dr. Boone until at least January 30, 2009. In a March 25, 2009 visit, Dr. Boone indicated that Plaintiff has experienced continued pain following his fall,

15

and that he fell with enough force to cause more than a simple strain-type injury. She thought it best to evaluate for facet or discal pathology which could likely have resulted from the high-impact fall. She recommended joint injections as well. On December 5, 2008, Plaintiff reported his pain at a six and seven on a ten-point scale. He stated that he does housework, and gets two to three hours of sleep per night. (R. at 767.) On January 30, 2009, Dr. Boone noted that Plaintiff was ambulating well without any assistive device and that he was able to perform transfers independently. (R. at 761.)

**11.** **Teresita Cruz, M.D./W. Jerry McCloud, M.D.**

In May 2009, state agency physician, Dr. Cruz, reviewed the record and assessed Plaintiff's physical functioning capacity. (R. at 779-86.) Dr. Cruz opined that Plaintiff can lift and carry twenty pounds occasionally and ten pounds frequently; stand and/or walk about two hours in a workday; and sit for about six hours in a workday. (R. at 780.) Dr. Cruz also opined that Plaintiff suffers limitations in his ability to push and pull. In addition, Dr. Cruz opined that Plaintiff can frequently climb ramps or stairs, balance, stoop, kneel, crouch or crawl, but that he can never climb ladders, ropes or scaffolds. (R. at 781.) Dr. Cruz reported that Plaintiff's allegations and statements concerning his pain are consistent with the record. (R. at 784.)

In August 2009, state agency physician, Dr. McCloud, affirmed Dr. Cruz's assessment. (R. at 818-19.)

**B. Mental Impairments**

**1.** **Donald Jay Weinstein, Ph.D.**

Dr. Weinstein examined Plaintiff on July 7, 2008. (R. at 334-37.) Plaintiff reported feeling depressed the last few months. He stated that he randomly cries. He explained that he

experiences ongoing pain in his right leg, hip, and knee as a result of his workplace injury.  He indicated that he gets a lot of headaches and experiences back pain.

Dr. Weinstein noted that Plaintiff "cried a great deal during the interview."  (R. at 334.) Plaintiff cried and stated, "I just want my life back."  *Id.*  He also indicated that he worries he will have to live with the pain the rest of his life.  He described symptoms of anxiety, stating that is hands sweat, he becomes short of breath, and his legs shake.  He reported that he eats "100 times what [he] used to."  (R. at 336.)  Plaintiff reported that he has been depressed since his injury.  He stated that he feels he can no longer take care of his family.  Dr. Weinstein noted that Plaintiff demonstrated no symptoms of cognitive dysfunction.  He noted that Plaintiff "shakes uncontrollably with anxiety and is overwhelmed by these feelings."  (R. at 337.)  Dr. Weinstein opined that Plaintiff suffers from anxiety disorder and depressive disorder as a result of his work injury.

The record indicates that a psychologist, Richard Barnett, Ph.D., from Weinstein & Associates also treated Plaintiff.  Dr. Barnett prepared a treatment summary on April 13, 2009 in which he indicated that he saw Plaintiff on March 2, March 30, and April 13, 2009.  (R. at 683.) Dr. Barnette noted that Plaintiff completes his activities of daily living, as well as minimal chores and limited distance walking.  He opined that Plaintiff suffers from limited concentration and slow pace.  He indicated that Plaintiff worries, which results in anxiety and a poor ability to cope with stress.

Another mental health professional, Mary McKeever, LPC, also prepared a treatment summary with respect to Plaintiff's treatment at Weinstein & Associates.  (R. at 724.)  LPC McKeever indicated on October 27, 2008 that Plaintiff had been seen on August 19, Octoer 14 and October 27, 2008.  She stated that Plaintiff was depressed over his inability to work as a

17

carpenter.  She further indicated that Plaintiff has an inability to concentrate.  She noted short-term goals of reducing depression and irritability and increasing physical activity.  She noted long-term goals of returning to work and increasing family interaction.

2.      **Beal Lowe, Ph.D.**

Dr. Lowe evaluated Plaintiff on behalf of the Ohio Bureau of Workers' Compensation on August 27, 2008.  (R. at 725-28.)  Plaintiff reported that he had experienced some "breakdowns" over the last few months, marked by random crying, emotional distress and poor sleep.  Dr. Lowe reported that Plaintiff cried a great deal during the interview.  Plaintiff reported a great deal of pain, as well as headaches.  He indicated that he attempted to enter a truck-driving program as part of a rehabilitation program, but he was unable to enter because he has a felony conviction.  He reported feeling depressed since his injury due to an inability to care for his family.  Dr. Lowe reported that Plaintiff presented as an "anxious man with a somewhat flat affect."  (R. at 725.)  Dr. Lowe indicated that Plaintiff "reported that his only non-injury related health problem was ulcers."  (R. at 726.)

Dr. Lowe administered the Burns Anxiety Inventory.  (R. at 726.)  He noted that Plaintiff indicated "a lot" of anxiety and nervousness, panic spells, and feeling tense and uptight.  *Id.*  He also reported "a lot" of racing thoughts, frightening fantasies, concerns of looking foolish, and fears of being alone or isolated.  *Id.*  Dr. Lowe also administered the Beck Depression Inventory. He reported that Plaintiff's score of 23 indicates moderate depression.  Dr. Lowe indicated that the examination supports the diagnoses of anxiety disorder and depressive disorder.  He opined that the symptoms are a result of Plaintiff's work-related accident.

### 3.     Jennifer Swain, Psy.D./ Kristen Haskins, Psy.D.

Dr. Swain reviewed Plaintiff's medical records on behalf of the state agency on May 22, 2009.  (R. at 734-51.)  She determined that Plaintiff suffers from depressive disorder and anxiety disorder.  (R. at 737, 739.)  She found that Plaintiff suffers mild limitations in completing her activities of daily living and in maintaining social functioning.  She further found that Plaintiff suffers moderate difficulties in his ability to maintain concentration, persistence or pace; understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule and maintain regular, punctual attendance; complete a normal workday or workweek; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting.  (R. at 744-49.)

Dr. Swain opined that Plaintiff appeared highly preoccupied by perceived pain and physical limitations, and that he has a limited ability to tolerate stress.  Dr. Swain concluded that Plaintiff is capable of completing some moderately complex tasks in an environment where there would be no strict production standards and where his duties were relatively static.  (R. at 750.)

On August 12, 2009, Dr. Haskins reviewed the record and affirmed Dr. Swain's assessment.  (R. at 817.)

### IV. THE ADMINISTRATIVE DECISION

On January 11, 2011, the ALJ issued his decision.  (R. at 9-18.)  At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §416.920(a)(4).  Although a dispositive finding at any step

gainful activity from his alleged onset date of June 12, 2007 through his date last insured of September 30, 2008.[3]  (R. at 11.)  The ALJ concluded that Plaintiff suffers from the following severe impairments on the date of last insured: status post spiral fracture of the right proximal femoral shaft; chronic myofascial pain in the right hip and thigh; degenerative disc disease of the cervical spine; hepatitis C; depressive disorder not otherwise specified; and anxiety disorder.  *Id.*  The ALJ also found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 12.)  At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC") as follows:

---

terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

[3] The AJL acknowledged that Plaintiff worked as a carpenter after his alleged onset date, but concluded that the position did not constitute substantially gainful activity because it lasted less than thirty days.  (R. at 28.)

> After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity (RFC) to perform sedentary work as defined in 20 CFR 404.1567(a) except that he could lift 10 pounds frequently and 20 pounds occasionally; stand or walk for at least two hours each in an eight-hour day; sit for up to six hours; kneel or squat only occasionally; never climb ladders, ropes, or scaffolds; and handle moderately complex tasks but not highly complex tasks. The claimant should avoid work environments that require strict production quotas or output. He is best suited for work environments where the duties are relatively static or stable.

(R. at 13.) In reaching this conclusion, the ALJ adopted the May 2009 physical RFC of Dr. Cruz, finding that Dr. Cruz "understands the Social Security Administration's disability programs and their evidentiary requirements." (R. at 16.) Based on Plaintiff's testimony and the ALJ's observations at the hearing, the ALJ added limitations with respect to Plaintiff's ability to kneel and squat. *Id.* In addition, the ALJ adopted the May 2009 mental RFC of Dr. Swain, finding it well supported and consistent with the evidence. *Id.* The ALJ also indicated that although Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms are not fully credible. According to the ALJ, Plaintiff's allegations as to the limiting effects are inconsistent with the objective medical evidence. (R. at 29.)

Relying on the VE's testimony, the ALJ determined that, through the date last insured, jobs existed in significant numbers in the state and national economy that Plaintiff could have performed. (R. at 16-17.) He therefore concluded that Plaintiff was not disabled under the Social Security Act at any time from June 12, 2007, the alleged onset date, through September 30, 2008, the date last insured. (R. at 18.)

## V. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to

proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42

U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if

supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial

evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

*Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286

(6th Cir. 1994)).

     Although the substantial evidence standard is deferential, it is not trivial.  The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v.

Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

1997)).

     Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision

of the Commissioner will not be upheld where the SSA fails to follow its own regulations and

where that error prejudices a claimant on the merits or deprives the claimant of a substantial

right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th

Cir. 2007)).

## VI. LEGAL ANALYSIS

Plaintiff raises numerous challenges to the ALJ's decision.  Specifically, Plaintiff contends that the ALJ committed reversible error in (1) failing to adequately account for the opinion of Dr. Swain in his RFC; (2) concluding that Plaintiff's condition of kidney stones does not constitute a severe impairment; (3) advancing improper hypothetical questions to the VE; and (4) discounting Plaintiff's credibility.  The Undersigned disagrees, and concludes that the ALJ did not commit reversible error.  The Undersigned also concludes that substantial evidence supports the ALJ's decision.

**A.      The ALJ adequately incorporated Dr. Swain's opinion into his RFC**

In his first assignment of error, Plaintiff contends that the ALJ failed to adequately incorporate Dr. Swain's opinion into his mental RFC.  (Statement of Specific Errors 8.)  A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments."  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a).  The determination of a claimant's RFC is an issue reserved to the Commissioner.  20 C.F.R. §§ 404.1527(e), 416.927(e).  Nevertheless, substantial evidence must support the Commissioner's RFC finding.  *Berry v. Astrue*, No. 1:09-CV-000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).  When considering the medical evidence and calculating the RFC, "'ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.'"  *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)); *see also Isaacs v. Astrue*, No. 1:08–CV–00828, 2009 WL 3672060, at

23

*10 (S.D. Ohio Nov. 4, 2009) (holding that an "ALJ may not interpret raw medical data in functional terms") (internal quotations omitted).

An ALJ is required to explain how the evidence supports the limitations that he or she sets forth in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96–8p, 1996 WL 374184, at *6–7 (internal footnote omitted).

Here, with respect to Plaintiff's mental limitations, the ALJ concluded that Plaintiff has the RFC to handle "moderately complex tasks but not highly complex tasks," and that he should "avoid work environments that require strict production quotas or output." (R. at 13.) In addition, the ALJ concluded that Plaintiff is "best suited for work environments where the duties are relatively static or stable." *Id.* In formulating this mental RFC, the ALJ adopted the opinion of Dr. Swain, finding it "well supported and consistent with the other substantial evidence of record." (R. at 16.)

Plaintiff contends that the ALJ committed reversible error in failing to "build[] upon" Dr. Swain's RFC opinion to include limitations in Plaintiff's ability to interact with the public, coworkers and supervisors, as well as a need to take extra breaks and an inability to remain on task throughout the work day. (R. at 7-8.) In support of his position, Plaintiff contends that Dr.

24

Swain noted that Plaintiff suffers moderate impairments in various areas relating to, among others, his ability to maintain concentration, persistence or pace, and to carry out detailed instructions.  (R. at 8.)  Plaintiff also points out that Dr. Swain indicated that he "appears to have some limitations tolerating stress."  (R. at 450.)  According to Plaintiff, the ALJ should have relied on these findings to formulate a more restrictive mental RFC, even though Dr. Swain considered these issues and did not.

The Undersigned finds no reversible error in the ALJ's determination of Plaintiff's mental RFC.  The ALJ adopted, verbatim, the mental RFC advanced by Dr. Swain.  (R. at 13.)  Dr. Swain arrived at her RFC despite having found that Plaintiff suffers from the limitations to which Plaintiff now points.  In addition, Dr. Haskins considered the same record, including the limitations and restrictions set forth in Dr. Swain's opinion, and agreed that Plaintiff is capable of performing at the RFC advanced by Dr. Swain and adopted by the ALJ.  Most significantly, however, the record contains no mental-health opinion that supports Plaintiff's position.  None of the mental health professionals who examined Plaintiff opined that he suffers limitations more restrictive than those imposed by Dr. Swain.  Indeed, Plaintiff relies on his own interpretation of the medical evidence, rather than that of a mental-health professional, to assert that a more restrictive mental RFC is necessary.  The same is true with respect to Plaintiff's contention concerning a need for extra breaks and an inability to remain on task.  Relying on the opinions of Drs. Swain and Haskins, the ALJ determined that Plaintiff's limitations in these regards are not significant enough to include in the RFC.  Plaintiff substitutes his own judgment for that of the ALJ and the physicians, and asks this Court to do the same.  This, the Court simply cannot do.  The ALJ's mental RFC is consistent with the objective evidence, and is thus supported by

substantial evidence. Accordingly, the Undersigned concludes that the ALJ did not commit reversible error in formulating Plaintiff's mental RFC.

**B.      The ALJ did not commit reversible error in concluding that Plaintiff does not suffer a severe impairment due to kidney stones**

Plaintiff next contends that the ALJ erred in failing to find that he suffers a severe impairment as a result of kidney stones. Where, as here, the ALJ determines that a claimant had a severe impairment at step two of the analysis, "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence." *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803, (6th Cir. 2003). Instead, the pertinent inquiry is whether the ALJ considered the "limiting effects of all [claimant's] impairment(s), even those that are not severe, in determining [the claimant's] residual functional capacity." 20 C.F.R. § 404.1545(e); *Pompa*, 73 F. App'x at 803 (rejecting the claimant's argument that the ALJ erred by finding that a number of her impairments were not severe where the ALJ determined that claimant had at least one severe impairment and considered all of the claimant's impairments in her RFC assessment); *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (same).

In addition, an ALJ generally does not err in failing to specifically mention each and every one of a claimant's impairment at step four so long as the record is clear that he or she considered the impairments in developing the RFC and the RFC accounts for limitations caused by the impairments. *Cf. Loy v. Sec'y of Health & Human Servs.*, 901 F.2d 1306, 1310 (6th Cir. 1990) ("An ALJ's individual discussion of multiple impairments does not imply that he failed to consider the effect of the impairments in combination, where the ALJ specifically refers to a 'combination of impairments' in finding that the plaintiff does not meet the listings."); *see also*

*McDaniel v. Astrue*, No. 1:10-cv-699, 2011 WL 5913973, *6 (S.D. Ohio Nov. 28, 2011) (finding no error where the ALJ "discussed every impairment advanced" by the plaintiff and stated that he considered the combined effects of these impairments); *Malone v. Comm'r of Soc. Sec.*, 507 Fed. App'x 470, 472 (6th Cir. 2012) (finding no reversible error in the RFC determination "because the ALJ considered all of the symptoms that were consistent with the medical evidence in determining his residual functional capacity").

Here, the Undersigned finds no reversible error in the ALJ's failure to conclude that Plaintiff suffers a severe impairment related to kidney stones.  First, the ALJ found other severe impairments at step two of the sequential evaluation process, including "status post spiral fracture of the right proximal femoral shaft, chronic myofasical pain in the right hip and thigh, degenerative disc disease of the cervical spine, hepatitis C, depressive disorder . . ., and anxiety disorder."  (R. at 11.)  Second, the ALJ specifically stated that he considered the "entire record" in formulating Plaintiff's RFC.  (R. at 13.)  He stated that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  *Id.*  Moreover, it is clear from his decision that the ALJ specifically considered the evidence related to Plaintiff's kidney stones.  He discussed Plaintiff's kidney stones at step two of the process.  (R. at 11.)  He specifically cited the medical sources related to Plaintiff's treatment for kidney stones, which demonstrates that he considered them. *Id.*  In addition, the ALJ found that although "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms," Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not fully credible because they are inconsistent with the objective medical evidence."  (R. at 14.)

Moreover, the record contains almost no evidence that Plaintiff's kidney stones caused physical limitations that would contradict the ALJ's RFC finding.  The only medical evidence related to kidney stones consists of records surrounding Plaintiff's May 2007 procedures to remove two kidney stones.  (R. at 386, 387.)  Around that time, Plaintiff reported to his doctor that he had passed eight kidney stones in the year prior to his visit.  (R. at 376.)  The remaining treatment records, spanning well into 2009, contain no reference to symptoms or difficulty related to kidney stones.  Although Plaintiff testified at the November 9, 2010 hearing that he passed 50-60 kidney stones in the three years prior to the hearing (R. at 39), the record contains no objective evidence to support Plaintiff's testimony.  He treated frequently throughout that period and none of his physicians documented any complaints related to kidney stones.  Indeed, in august 2007, Plaintiff reportedly told Dr. Lowe that his "only non-injury related health problem was ulcers."  (R. at 726.)  Finally, the ALJ concluded that Plaintiff's testimony lacks credibility because it is inconsistent with the objective medical evidence.  (R. at 14.)

Accordingly, the ALJ did not commit reversible error in concluding that Plaintiff's does not suffer a severe impairment due to kidney stones.  For the reasons set forth above, the Undersigned further concludes that substantial evidence supports the ALJ's conclusion.

**C.      The ALJ did not err in posing hypothetical questions to the VE**

Plaintiff next asserts that the ALJ committed reversible error by asking improper questions to the VE.  "In order for a VE's testimony to constitute substantial evidence that a significant number of jobs exist, the questions must accurately portray a claimant's physical and mental impairments."  *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011); *Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 865 (6th Cir. 2011).  In formulating a hypothetical question, however,

an ALJ is only "required to incorporate those limitations accepted as credible by the finder of

fact." *Carrelli v. Comm'r of Soc. Sec.*, 390 F. App'x 429, 437 (6th Cir. 2010).

Here, the Undersigned finds no reversible error in the hypothetical questions the ALJ

posed to the VE.  Plaintiff contends that the ALJ erred in failing to include in his hypothetical

questions limitations related to a need for extra breaks; a need to miss days or weeks of work due

to depression and anxiety; and a need to have the option to sit or stand on the job.  (R. at 13.)  As

discussed above, however, the ALJ did not err in omitting a need for extra breaks or increased

absences from his RFC because no medical professional opined that Plaintiff suffers such

limitations.  Likewise, Plaintiff points to nothing in the record to support his assertion that he

requires an option to sit or stand on the job.  Not one of the medical professionals who treated

Plaintiff imposed such a restriction.  Accordingly, the ALJ did not err in omitting these

restrictions from his RFC.  Because his hypothetical questions incorporated the limitations set

forth in his RFC, the ALJ did not err in posing hypothetical questions to the VE.

**D.      The ALJ did not err in assessing Plaintiff's credibility**

Finally, Plaintiff contends that the ALJ erred in assessing his credibility.  (Statement of

Specific Errors 12, ECF No. 13.)   The Sixth Circuit has provided the following guidance in

considering an ALJ's credibility assessment:

> Where the symptoms and not the underlying condition form the basis of the
> disability claim, a two-part analysis is used in evaluating complaints of disabling
> pain. 20 C.F.R. § 416.929(a); *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001);
> *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994). First, the ALJ will ask
> whether the there is an underlying medically determinable physical impairment
> that could reasonably be expected to produce the claimant's symptoms. 20 C.F.R.
> § 416.929(a). Second, if the ALJ finds that such an impairment exists, then he
> must evaluate the intensity, persistence, and limiting effects of the symptoms on
> the individual's ability to do basic work activities. *Id.*

*Rogers*, 486 F.3d at 247.

29

"The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor." *Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 995 (6th Cir. 2007) (declining to disturb the ALJ's credibility determination, stating that: "[w]e will not try the case anew, resolve conflicts in the evidence, or decide questions of credibility" (citation omitted)).  This deference extends to an ALJ's credibility determinations "with respect to [a claimant's] subjective complaints of pain." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009) (quoting *Siterlet v. Sec'y of Health & Hum. Servs.*, 823 F.2d 918, 920 (6th Cir.1987)).  Despite this deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters*, 127 F.3d at 531.  Furthermore, the ALJ's decision on credibility must be "based on a consideration of the entire record." *Rogers*, 486 F.3d at 247 (internal quotation omitted).  An ALJ's explanation of his or her credibility decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at 248; *see also Mason v. Comm'r of Soc. Sec. Admin.*, No. 1:06–CV–1566, 2012 WL 669930, at *10 (N.D. Ohio Feb. 29, 2012) ("While the ALJ's credibility findings 'must be sufficiently specific, the intent behind this standard is to ensure meaningful appellate review.") (citation omitted).

"Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531.  In addition, the Regulations list a variety of factors an ALJ must consider in evaluating the severity of symptoms, including a claimant's daily activities; the effectiveness of

30

medication; and treatment other than medication.  20 C.F.R. § 404.1529(c)(3); SSR 96–7p, 1996

WL 374186 (July 2, 1996); *but see Ewing v. Astrue*, No. 1:10–cv–1792, 2011 WL 3843692, at

*9 (N.D. Ohio Aug. 12, 2011) (suggesting that although an ALJ is required to consider such

factors, he or she is not required to discuss every factor within the written decision) (Report and

Recommendation later adopted).

  Here, the Undersigned declines to disturb the ALJ's credibility determination.  In

discounting Plaintiff's credibility, the ALJ specifically noted the conflict between his testimony

and the objective medical evidence: "[Plaintiff's] statements concerning the intensity,

persistence, and limiting effects of these symptoms are not fully credible because they are

inconsistent with the objective medical evidence."  (R. at 14.)  Furthermore, the ALJ's

determination is supported by substantial evidence.  As Defendant points out, although Plaintiff

testified that he consumes six Vicodin per day (R. at 38), the medical evidence reflects that he

takes just two per day.  (R. at 477.)  In addition, in February 2008, Dr. Gallanosa indicated that

Plaintiff "is very young, and there is no reason to accept anything other than a full recovery."

(R. at 349.)  Likewise, the professionals that monitored Plaintiff's progress in the eight-week

occupational rehab program indicated that, despite his complaints of pain, Plaintiff "does not

demonstrate any physical barriers that would limit his ability to return to work."  (R. at 339.)

Similarly, Dr. Kerner opined that Plaintiff "does appear ready to resume work at medium duty

and a sit-down job at computers would probably be ideal."  (R. at 642.)  Finally, and most

importantly, Dr. Cruz noted in her opinion that Plaintiff's complaints concerning his pain were

consistent with the record.  (R. at 784.)  Even finding his complaints credible, however, Dr. Cruz

opined that Plaintiff is capable of performing work with *less restrictive* limitations than what the

ALJ ultimately imposed.[4]  (R. at 781.)  Accordingly, the ALJ did not commit reversible error in discounting Plaintiff's credibility.  For these same reasons, the ALJ's credibility determination is supported by substantial evidence.

## VII. CONCLUSION

For the reasons set forth herein, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and the Commissioner's decision be **AFFIRMED**.

## VIII. PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994

---

[4] Although the ALJ adopted Dr. Cruz's RFC assessment, he added additional limitations based on Plaintiff's testimony and his own observations at the hearing.  (R. at 16.)

(6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: August 1, 2013            /s/ *Elizabeth A. Preston Deavers*
                              Elizabeth A. Preston Deavers
                              United States Magistrate Judge